UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

  v.        Case No. 6:08-cv- 670 - Occ - 22 KRS

REAL PROPERTY, INCLUDING
ANY BUILDINGS, APPURTENANCES,
AND IMPROVEMENTS THEREON,
LOCATED AT 614 LAKE AVENUE,
ORLANDO, FL,

REAL PROPERTY, INCLUDING
ANY BUILDINGS, APPURTENANCES,
AND IMPROVEMENTS THEREON,
LOCATED AT 709 EUCLID AVENUE,
ORLANDO, FL,

REAL PROPERTY, INCLUDING
ANY BUILDINGS, APPURTENANCES,
AND IMPROVEMENTS THEREON,
LOCATED AT 1159 DELANEY AVENUE,
ORLANDO, FL,

REAL PROPERTY, INCLUDING
ANY BUILDINGS, APPURTENANCES,
AND IMPROVEMENTS THEREON,
LOCATED AT 3801 CAROLINA AVENUE,
RICHMOND, VIRGINIA,

PROCEEDS FROM THE
SALE OF 509 RIVERFRONT
PARKWAY, CHATTANOOGA, TN,

REAL PROPERTY, INCLUDING
ANY BUILDINGS, APPURTENANCES,
AND IMPROVEMENTS THEREON,
LOCATED AT 4905 RESEARCH DRIVE,
HUNTSVILLE, AL,

   Defendants.

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by and through the undersigned Assistant United States Attorney, in a civil cause for forfeiture *in rem*, alleges upon information and belief, and in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure the following:

1.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

2.      This court has *in rem* jurisdiction over the defendant properties pursuant to:

      a.      28 U.S.C. § 1355(b)(1)(A), because pertinent acts of omissions giving rise to the forfeiture occurred in the Middle District of Florida; and

      b.      28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

3.      Venue lies within the Middle District of Florida pursuant to 28 U.S.C. § 1395(a) because the instant civil action accrued in this judicial district and 28 U.S.C. § 1395(b) because the defendant properties are located within the Middle District of Florida.

4.      This is a civil action *in rem* brought pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of the defendant properties involved in the commission of the violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(B) for forfeiture of the defendant properties involved in the commission of the violations of 18 U.S.C. §§ 1956 and 1957 (money laundering).

2

5.    The Court's authority to order forfeiture of property for violations of 18 U.S.C. § 1343 is found upon 18. U.S.C. § 981(a)(1)(C).  Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses.  18 U.S.C. § 981(a)(1)(C).  A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), includes offenses listed in 18 U.S.C. § 1961(1).  Specifically, 18 U.S.C. § 1961(1) includes as an offense any act which is indictable under 18 U.S.C. § 1343.

6.    18 U.S.C. § 981(a)(1)(A) provides for the forfeiture of any property, real or personal, involved in a transaction in violation of 18 U.S.C. §§ 1956 and 1957. The defendant properties described below are subject to forfeiture on the grounds that the properties were knowingly purchased with the proceeds of a wire fraud conspiracy. Because those transactions involved more than $10,000 of criminally derived funds and were structured to disguise the source of those funds, they were purchased in violation of 18 U.S.C. §§ 1956 and 1957, and are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) .  Additionally, because the financial transactions involved in the purchase of the 3801 Carolina Avenue property promoted a specified unlawful activity (wire fraud violations), the proceeds from the sale of that property are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(B).

7.    The defendant properties are more fully described as follows:

a)    614 Lake Avenue, Orlando, FL, legally described as:

Lot 1 of BOUSTAN, A REPLAT, according to the Plat thereof, recorded in Plat Book 49, at Page 13, of the Public Records of Orange County, Florida.

b)  709 Euclid Avenue, Orlando, FL, legally described as:

Lot 9, and a strip of land 60 feet wide on the East side thereof, R. F. STARKEY'S ADDITION TO ORLANDO, according to the plat thereof as recorded in Plat Book A, page 11, of Public Records of Orange County, Florida.

c)  1159 Delaney Avenue, Orlando, FL, legally described as:

Unit 5, Briercliff Commons Condominium, according to the Declaration of Condominium thereof, recorded in Official Records Book 6456, Page 4871, re-recorded in Official Records Bool 6487, Page 3028, of the Public Records of Orange County, Florida, together with an undivided interest or share in the common elements appurtenant thereto, and any amendments thereto.

d)  3801 Carolina Avenue, Richmond, VA, legally described as:

PARCEL II:

ALL that certain lot, piece or parcel of land, lying and being in Brookland Magisterial District, Henrico County, Virginia, bounded and described as follows:

BEGINNING at a point designated by a rod on the eastern line of Carolina Avenue 664.36 feet south of the southern line of Laburnum Avenue, and from said point of beginning extending S 74°52' 00" E., 282.55 feet to a rod; thence N. 15° 08' 00' E., 55.00 feet to a rod; thence S. 70°52' 00" E., 15 feet to a rod; thence S. 15° 18' 30" W., 55.00 feet to a "+" in rail; thence S. 15° 18' 30" W., 439.02 feet to a rod, thence N. 74° 41' 30" W., 312.39 feet to a rod; thence along a curve to the left having a radius of 328.34 feet, a distance of 104.04 feet to a rod; thence continuing along the eastern line of Carolina Avenue N. 15° 08' 00" E., 45.13 feet to a rod; thence N. 15° 08' 00" E., 290.63 feet to a rod, said rod being the point and place of beginning, all as more particularly shown on the plat of survey prepared by Austin Brockenbrough and Associates, Civil Engineers, dated April 20, 1972, and referred to above, and being designated thereon as Pel "B", containing 3.019 Ac., and also known as 3801 Carolina Avenue.

BEING the same real estate conveyed to Alfred J. Cohn, by deed of liquidation, from Spencer Realty Company, Inc., a Virginia corporation and Alfred J. Cohn and Jane S. Cohn, dated August 30, 1977, recorded October 20, 1977, in the Clerk's Office, Circuit Court, Henrico County, Virginia in Deed Book 1732, page 539.

4

e)      Proceeds from the sale of 509 Riverfront Parkway, Chattanooga, TN

f)      4905 Research Drive, Huntsville, AL, legally described as:

All that part of the Southwest Quarter of Section 32, Township 3 South, Range 1 West of the Huntsville Meridian, Madison County, Alabama. Particularly described as beginning at a concrete monument at the Southwest corner of the property herein described; said point of true beginning is further described as being North 86 degrees 34 minutes East, 1020.05 feet and North 03 degrees 26 minutes West 484.25 feet from the Southwest corner of Section 32, Township 3, South, Range 1 West. Thence from the point of true beginning North 03 degrees 26 minutes West, 561.10 feet to a concrete monument on the South margin of an 80.00 foot right-of-way for Research Drive; thence along the South margin of said right-of-way, North 86 degrees 57 minutes East, 326.56 feet to a concrete monument at the Northwest corner of a 4.70 acre tract occupied by American Data Corporation; thence along the West Boundary of said 4.70 acre tract, South 03 degrees 03 minutes East, 558.93 feet to a concrete monument; thence South 86 degrees 34 minutes West, 322.81 feet to the point of true beginning and containing 4.17 acres more or less.

Subject an easement reserved by the University of Alabama Huntsville Foundation, its successors, grantees, and assigns, for the installation and maintenance of utilities, sewers, and drainage facilities on or over, across, beneath, and within a strip 25.0 feet in width taken evenly off each boundary of the above described property.

8.      The defendants have not been seized but they are located within this district and/or within the jurisdiction of the Court. The United States does not request authority from the Court to seize the real property defendants at this time. However, the Untied States does seek to seize the proceeds from the sale of the property located at 3801 Carolina Avenue. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

a.      post notice of this action and a copy of the Complaint on the defendant real properties;

b.      serve notice of this action on the defendant real property owner(s),

5

and any other person or entity who may claim an interest in the defendants, along with a copy of this Complaint;

c.    file a lis pendens in county records of the defendant real property's status as a defendant in this *in rem* action.

9.    Specific details of the facts and circumstances supporting the forfeiture of the defendant properties are contained in the Affidavit of Special Agent Steven McCabe, with the Criminal Investigation Division of Internal Revenue Service, Department of Treasury, which is attached hereto as Exhibit A and fully incorporated herein by reference.

10.    As required by Rule G(2)(f), the facts set forth in the attached affidavit support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, for the reasons set forth in the attached affidavit, there exists probable cause to believe that the defendant properties constitute or are derived from proceeds traceable to a violation of 18 U.S.C. § 1343 and are involved in a transaction or attempted transaction in violations of 18 U.S.C. §§ 1956, 1957, and constitute or are derived from proceeds traceable to a violation of 18 U.S.C. § 1343, and therefore, are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), (a)(1)(A) and (a)(1)(B).

WHEREFORE, the United States respectfully requests that the process of forfeiture be issued against the defendant currency; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed, that the court decree the condemnation and forfeiture of the properties to the United States for disposition according to law, and that the United States be granted such other relief as the court deems just and proper.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By: _____
    Nicole M. Andrejko
    Assistant United States Attorney
    Florida Bar No. 0820601
    501 West Church St., Suite 300
    Orlando, FL 32805
    Telephone: (407) 648-7500
    Facsimile: (407) 648-7643
    E-mail: Nicole.Andrejko@usdoj.gov

7

## **VERIFICATION**

I, Steven McCabe, hereby verify and declare under penalty of perjury as provided by 28 U.S.C. § 1746 that I am a Special Agent with the United States Internal Revenue Service, that I have read the foregoing Verified Complaint *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true and correct to my own knowledge, except those matters herein stated to be alleged on information and belief and, as to those matters, I believe them to be true and correct.

The sources of my knowledge and information, and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case and other cases.

Executed this _24th_ day of April, 2008.

_____
Steven McCabe, Special Agent
Internal Revenue Service

8

**AFFIDAVIT**

I, Steven McCabe, being duly sworn, depose and state the following:

1.     I am a Special Agent with the Criminal Investigation Division of Internal

Revenue Service, Department of Treasury, and have been a Special Agent for fourteen

years. In my capacity as an Internal Revenue Service Special Agent, I have

participated in numerous money laundering investigations, during the course of which I

have conducted physical and electronic surveillance, executed search warrants,

reviewed voluminous bank records, and analyzed complex financial transactions of

individuals laundering money. I have also had experience in debriefing defendants,

participant witnesses, informants, and other persons who have personal experience and

knowledge of the amassing, spending, converting, transporting, distributing, and

concealing of proceeds of money laundering.

2.     This investigation is being conducted by the Internal Revenue Service

(IRS). The investigation thus far has consisted of physical surveillance, interviews,

records requests, undercover operations, public record checks, and analysis and

examination of bank records and other miscellaneous documents. Any facts or

circumstances which are mentioned in this affidavit are familiar to me either through my

direct participation in the related investigation or from my discussions with witnesses

and other Special Agents. I have familiarized myself with all of the documents and

records obtained thus far in this investigation, either directly or from a review of reports

and records. Because this affidavit is being submitted for the limited purpose of

establishing probable cause to forfeit the real properties and the proceeds from the sale

of 509 Riverfront Parkway listed below, I have not included every fact I have learned

during this investigation.

3.    This affidavit is made in support of the forfeiture of the following real properties:

   (1)    3801 Carolina Avenue, Richmond, VA 23222

          PARCEL II:

          ALL that certain lot, piece or parcel of land, lying and being in Brookland
          Magisterial District, Henrico County, Virginia, bounded and described as
          follows:

          BEGINNING at a point designated by a rod on the eastern line of
          Carolina Avenue 664.36 feet south of the southern line of Laburnum
          Avenue, and from said point of beginning extending S 74 degrees 52' 00'
          E., 282.55 feet to a rod; thence N. 15 degrees 08'  00" E., 55.00 feet to a
          rod; thence S. 7052' 00" E., 15 feet to a rod; thence S. 15 degrees 18' 30"
          W., 55.00 feet to a "+" in rail; thence S. 15 degrees 18' 30" W., 439.02
          feet to a rod, thence N. 74 41' 30" W., 312.39 feet to a rod; thence along
          a curve to the left having a radius of 328.34 feet, a distance of 104.04 feet
          to a rod; thence continuing along the eastern line of Carolina Avenue N.
          15 degrees 08' 00" E., 45.13 feet to a rod; thence N. 15 degrees 08' 00"
          E., 290.63 feet to a rod, said rod being the point and place of beginning,
          all as more particularly shown on the plat of survey prepared by Austin
          Brockenbrough and Associates, Civil Engineers, dated April 20, 1972,
          and referred to above, and being designated thereon as Pel "B",
          containing 3.019 Ac., and also known as 3801 Carolina Avenue.

          BEING the same real estate conveyed to Alfred J. Cohn, by deed of
          liquidation, from Spencer Realty Company, Inc., a Virginia corporation
          and Alfred J. Cohn and Jane S. Cohn, dated August 30, 1977, recorded
          October 20, 1977, in the Clerk's Office, Circuit Court, Henrico County,
          Virginia in Deed Book 1732, page 539;

   (2)    614 Lake Avenue, Orlando, Florida 32806

          Lot 1 of BOUSTAN, A REPLAT, according to the Plat thereof, recorded in
          Plat Book 49, at Page 13, of the Public Records of Orange County,
          Florida;

   (3)    709 Euclid Avenue, Orlando, Florida 32806

          Lot 9, and a strip of land 60 feet wide on the East side thereof, R. F.
          STARKEY'S ADDITION TO ORLANDO, according to the plat thereof as
          recorded in Plat Book A, page 11, of Public Records of Orange County,
          Florida;

(4)    1159 DeLaney Avenue, Orlando, Florida 32806

Unit 5, Briercliff Commons Condominium, according to the
Declaration of Condominium thereof, recorded in Official Records
Book 6456, Page 4871, re-recorded in Official Records Bool 6487,
Page 3028, of the Public Records of Orange County, Florida,
together with an undivided interest or share in the common
elements appurtenant thereto, and any amendments thereto; and

(5)    4905 Research Drive, Huntsville, AL

All that part of the Southwest Quarter of Section 32, Township 3 South,
Range 1 West of the Huntsville Meridian, Madison County, Alabama.
Particularly described as beginning at a concrete monument at the
Southwest corner of the property herein described; said point of true
beginning is further described as being North 86 degrees 34 minutes East,
1020.05 feet and North 03 degrees 26 minutes West 484.25 feet from the
Southwest corner of Section 32, Township 3, South, Range 1 West.
Thence from the point of true beginning North 03 degrees 26 minutes
West, 561.10 feet to a concrete monument on the South margin of an
80.00 foot right-of-way for Research Drive; thence along the South margin
of said right-of-way, North 86 degrees 57 minutes East, 326.56 feet to a
concrete monument at the Northwest corner of a 4.70 acre tract occupied
by American Data Corporation; thence along the West Boundary of said
4.70 acre tract, South 03 degrees 03 minutes East, 558.93 feet to a
concrete monument; thence South 86 degrees 34 minutes West, 322.81
feet to the point of true beginning and containing 4.17 acres more or less.

Subject to an easement reserved by the University of Alabama
Huntsville Foundation, its successors, grantees, and assigns,
for the installation and maintenance of utilities, sewers, and
drainage facilities on or over, across, beneath, and within a
strip 25.0 feet in width taken evenly off each boundary of the
above described property.

4.     As set forth in this affidavit, there is probable cause to believe that these

assets constitute proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and constitute

property involved in a transaction in violation of 18 U.S.C. §§ 1956 and 1957 (money

laundering) and are therefore subject to forfeiture by the United States of America,

pursuant to 18 U.S.C. §§ 981(a)(1)(C) (proceeds of wire fraud) and (a)(1)(A) (property

involved in money laundering).

5.    The Court's authority to order forfeiture of property for violations of 18

U.S.C. §1343 is found in 18 U.S.C. § 981(a)(1)(C).  Section 981(a)(1)(C) provides for

the civil forfeiture of any property, real or personal, which constitutes or is derived from

proceeds from any offense constituting "specified unlawful activity" as defined in 18

U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses.  18 U.S.C. §

981(a)(1)(C).  A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7),

includes offenses listed in 18 U.S.C. § 1961(1).  Specifically, 18 U.S.C. § 1961(1)

includes as an offense any act which is indictable under 18 U.S.C. § 1343.

6.    The investigation thus far indicates that proceeds of violations of 18

U.S.C. § 1343 (wire fraud) were used to purchase the assets described more fully below

with the intent to conceal or disguise their illegal source, in violation of 18 U.S.C. §

1956(a)(1)(B)(i).  These proceeds were also used to purchase property located at **3801

Carolina Avenue, Richmond, Virginia,** in order to promote the carrying on of specified

unlawful activities, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  In other words, FRANK

L. AMODEO ("AMODEO") bought the property listed below with the proceeds from the

wire fraud transactions in order to conceal or hide the source of the funds.  He also

used these funds to purchase property located at **3801 Carolina Avenue, Richmond,

Virginia,** to promote or carry on specified unlawful activity, and is therefore subject to

forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  Further, the transactions detailed below

were made in violation of 18 U.S.C. § 1957(a) because the funds used to purchase the

properties were derived from wire fraud transactions, were in excess of $10,000.00 and

AMODEO knew the funds were criminally derived and, as such, are subject to forfeiture

pursuant to 18 U.S.C. § 981(a)(1)(A).

## BACKGROUND

7.    FRANK L. AMODEO is a disbarred attorney formerly licensed in the state of Georgia who was convicted in federal court in Georgia of committing fraud. The conviction resulted in a two year prison sentence. AMODEO's conviction was a result of stealing funds from a client. AMODEO was sentenced to 2 years imprisonment. AMODEO spent 6 months at a federal boot camp. After being released from the boot camp, AMODEO spent approximately 5 months in a halfway house located in Maitland, Florida. While residing at the halfway house, AMODEO violated the conditions of the halfway house and was sent back to prison to serve the remainder of his sentence. AMODEO was released from prison in September 2000.

8.    Beginning in October 2004, AMODEO and other co-conspirators were involved in a massive tax fraud, wire fraud, and money laundering scheme. The entities used by AMODEO during the scheme included AEM, AQMI Strategy Corporation (AQMI), Mirabilis Ventures (Mirabilis), Presidion Corporation, Presidion Solutions, Quantum Delta Enterprises (Quantum), Wellington Capital Group (Wellington), and various other entities. Although AMODEO may not have been listed as a director, officer, or shareholder for the companies involved in the scheme, AMODEO and other co-conspirators directed and controlled the business activities of all the companies.

9.    AMODEO gained control of Presidion Solutions, a Michigan-based holding company for several professional employment organizations (PEOs). Presidion Solutions, through its PEO subsidiaries, provided comprehensive and integrated resource management services (which included payroll services) to small to medium

size businesses. Presidion Solutions was a wholly owned subsidiary of Presidion Corporation, a former publicly traded corporation.

10.    According to the contracts signed by the clients when Presidion Solutions (or its predecessors) started providing services to the clients, Presidion Solutions became the co-employer of its clients' employees and assumed the liabilities and responsibilities for reporting and paying to the IRS the payroll wages and the payroll taxes of the worksite employees. The benefit for the clients for hiring Presidion Solutions was a better workman's compensation insurance rate and reduced administrative costs to their businesses.

11.    Based upon the clients' payroll cycle, a client would e-mail, fax, or mail the number of hours worked by the worksite employee(s) to Presidion Solutions. After receiving the information, Presidion Solutions computed the amount of Federal Insurance Contributions Acts (FICA) taxes, Medicare, withholding taxes, workman's compensation insurance, and 401K contributions to be added to the clients' bill, along with Presidion Solutions' administrative fee. Presidion Solutions would then e-mail, fax, or mail this information back to the clients, who would then either direct debit, mail, or wire the funds to Presidion Solutions.

12.    From 2001 through 2005, Presidion Solutions acquired 7 PEOs, which made up Presidion Solutions' "book of business," i.e., the contracts Presidion Solutions had with its clients. In 2001, Presidion Solutions acquired Sunshine Staff Leasing, Sunshine Companies I, Sunshine Companies II, Sunshine Companies III, and Sunshine Companies IV (herein after referred to as the "Sunshine Companies"). Subsequently, the Sunshine Companies did business as Presidion Solutions I, Presidion Solutions II,

6

Presidion Solutions III, Presidion Solutions IV, and Presidion Solutions V, respectively. In 2005, Presidion Solutions acquired Paradyme, doing business as Presidion Solutions VI, and Professional Benefit Solutions, doing business as Presidion Solutions VII (PBS). With the acquisitions of the Sunshine Companies, Paradyme, and PBS, Presidion Solutions had approximately 1,800 clients and approximately 27,000 worksite employees.

13.     Presidion Solutions engaged in "SUTA dumping," which involves "transferring" the book of business from one PEO to another, depending on the State Unemployment Tax Act (SUTA) rates for the PEOs. The SUTA rates changed on a yearly basis, so depending on which PEO had the best SUTA rate for the year, the PEO with the lowest SUTA rate would report the payroll wages and the payroll taxes. The bulk of the Presidion Solutions' book of business was reported by PBS during 2005 and 2006.

14.     During 2005, the funds sent to Presidion Solutions from the clients were deposited into Bank of America account #5481578981 in the name of Paradyme ("Paradyme's BOA Account"). Funds used to pay the worksite employee(s) would be paid out through various Presidion Solutions' controlled accounts depending on whether the employee(s) received their wages via a check or a direct deposit. Even though the funds paid to Presidion Solutions were deposited into Paradyme's account during the year, the wages and payroll tax liabilities were reported by PBS. Once the funds were released to pay the worksite employee(s), Paradyme's BOA Account would be automatically transferred and the funds would be deposited into a different Bank of America account, #548151578978, in the name of Presidion Solutions, titled as the

7

Ultimate Master Account ("Ultimate Master Account"). The funds used to pay the federal payroll taxes, insurance payments, state taxes, and 401K contributions for the PEO subsidiaries were maintained in the Ultimate Master account.

## SCHEME

15.     Beginning in October 2004 and continuing through March 2008, AMODEO and co-conspirators knowingly and willfully defrauded the clients of Presidion Solutions by offering payroll services to the clients, collecting the funds from the clients via wire transfers, and willfully failing to pay the payroll taxes to the IRS for PBS and the Sunshine Companies. AMODEO and co-conspirators knowingly failed to remit to the IRS payroll taxes totaling approximately $181,807,552.42, including approximately $124,618,674,02 in FICA and withholding taxes (also referred to as trust fund taxes) for PBS and the Sunshine Companies.

16.     At the direction of AMODEO and co-conspirators, Presidion Solutions notified each client by invoice of the amount owed and subsequently collected funds, including funds that should have been used to pay the payroll taxes, via wire transfers from the clients and deposited these funds in a Presidion Solutions controlled account and then into the Ultimate Master account. At no time during the scheme were the clients informed that the funds for the payroll taxes represented to them via the invoices and paid to Presidion Solutions were not being used this way.

17.     The bulk of the funds that were diverted from Presidion Solutions' clients were laundered through three (3) main accounts during the scheme. Although the names of the corporations changed and AMODEO and other co-conspirators switched accounts throughout the scheme, the scheme remained the same: divert funds intended

8

to pay the payroll taxes. Although the three (3) main accounts used by AMODEO and the other co-conspirators to launder the proceeds of the wire fraud are detailed below, this affidavit only reflects a small portion of the total fraud committed by AMODEO and his co-conspirators.

18.    In the early part of the scheme (October 2004), AMODEO used AQMI, a corporation that he controlled, to steal the payroll tax funds. AMODEO signed a consulting agreement with Presidion Solutions to allegedly assist the company by reducing the payroll tax liabilities accrued by the Sunshine Companies. At the time when AMODEO began assisting Presidion Solutions with the reduction of the payroll tax debt, Presidion Corporation was preparing for an annual audit. In an attempt to have Presidion Corporation appear more profitable as a publicly traded company, Presidion Solutions wanted the Sunshine Companies' payroll tax liabilities removed from Presidion Corporation's financial statements. Instead of helping Presidion Solutions with the payroll tax problem, AMODEO, with the knowledge of co-conspirators, directed the transfer of the payroll tax funds to accounts controlled by AMODEO. After stealing the funds from Presidion Solutions, AMODEO and co-conspirators then laundered the funds through various corporations he controlled to disguise the source of the funds. AMODEO and co-conspirators used fictitious consulting agreements, service agreements and other fraudulent business transactions as a means to conceal the theft of payroll tax funds.

19.    During 2004, the clients received an invoice from Presidion Solutions and paid their invoice by wiring their funds to accounts controlled by Presidion Solutions. AMODEO then directed funds to be transferred to AmSouth Bank account #55292976

9

in the name of AQMI ("AQMI AmSouth Account"). In December 2004, the AQMI
AmSouth Account received the following deposits from the Ultimate Master Account:

- December 10, 2004-$772,471.84

- December 13, 2004-$1,410,375.52

- December 15, 2004-$162,937.87

- December 16, 2004-$477,200.64

- December 17, 2004-$1,284,986.58

- December 20, 2004-$88,054.24

- December 21, 2004-$75,307.09

- December 22, 2004-$1,082,588.09

- December 23, 2004-$1,056,917.79

- December 24, 2004-$894,645.38

- December 28, 2004-$102,144.26

- December 30, 2004-$353,329.54

- December 31, 2004-$720,834.55

The total amount of deposits into the AQMI AmSouth Account received from the
Ultimate Master account during the month of December was approximately
$8,905,201.25. Once AMODEO had laundered the funds from Presidion Solutions
through AQMI, AMODEO then transferred the money to his personal accounts and used
the funds to purchase his residence, his cars, and other personal items. AMODEO also
began to launder the funds to other accounts that he controlled to finance the purchase
of other businesses, further concealing the source of the stolen funds.

10

20.    After funds that were intended to pay the payroll taxes had been paid to Presidion Solutions by the clients, they were transferred to the AQMI AmSouth Bank Account. AMODEO then transferred a portion of those funds to Wellington's SunTrust Bank Account #100002640116 ("Wellington Sun Trust Account"), a company controlled by AMODEO. AMODEO controlled the Wellington Sun Trust Account and transferred funds from this account to his personal accounts or to other corporate accounts that he controlled.

21.    In late December 2004, AMODEO, through Wellington, purchased the Sunshine Companies, including the existing payroll tax liabilities, but not Presidion Solutions' book of business, which had been transferred to Paradyme. AMODEO financed the purchase of the Sunshine Companies with funds he diverted through the AQMI AmSouth Account and the Wellington Sun Trust Account. On December 17, 2004, AMODEO caused to be transferred approximately $1,284,986.58 from the Ultimate Master Account to the AQMI AmSouth Account, then AQMI transferred approximately $1,000,000.00 to the Wellington Sun Trust Account on December 20, 2004. AMODEO then used the funds from the Wellington Sun Trust Account to purchase multiple cashier's checks, on December 20, 2004 and December 29, 2004, to make the purchase of the Sunshine Companies for approximately $500,000.00 from Presidion Solutions.

22.    In June 2005, AMODEO was authorized by co-conspirators to open First Southern Bank account 2058256506 in the name of Presidion Solutions, titled as the Reserve Account ("Reserve Account"). This account was opened to receive funds transferred from the Ultimate Master Account, which held the funds that should have

11

been used to pay the payroll taxes, and to conceal the source of the funds from the employees, regulators, IRS, and other creditors. AMODEO had sole signature authority on the Reserve Account; however, Daniel Myers, an accountant for AMODEO, was authorized to order outgoing wires from the Reserve Account at the direction of AMODEO. Witnesses have stated that AMODEO controlled the banking activity for the Reserve Account. Documents and e-mails secured during the investigation reveal that AMODEO gave the instructions on when to move the funds into this account from the Ultimate Master Account and when to transfer funds out of this account. The funds in this account were dispersed at AMODEO's direction, for his benefit and the benefit of other co-conspirators. During the latter half of 2005, AMODEO diverted approximately $64,600,000.00 of funds paid to Presidion Solutions by clients, which should have been used to pay payroll taxes, through the Reserve Account. The following transactions are a sample of the transactions involving the clients' funds that were diverted by AMODEO and laundered through the Reserve Account to his personal bank accounts:

- On August 15, 2005, $500,000.00 was transferred from the Ultimate Master Account to the Reserve Account. On the same date, $525,000.00 was transferred from the Reserve Account to Wellington's Mercantile Bank Account #7600303414 ("Wellington's Mercantile Bank Account"). On August 16, 2005, $500,000.00 was withdrawn from Wellington's Mercantile Bank Account via check 10031 and the funds were deposited in AMODEO'S Janney Montgomery Scott Account #84493091.

- On September 29, 2005; September 30, 2005; and October 3, 2005, $600,000.00; $700,000.00; and $600,000.00, respectively, was transferred from the Ultimate Master Account to the Reserve Account. On October 4, 2005, $2,000,000.00 was transferred from the Reserve Account to First Southern Bank Account #3055441306, in the name of Berman Kean & Riguera IOTA ("Berman's First Southern Bank Account I"). On October 6, 2005, $2,000,000.00 was transferred from

12

Berman's First Southern Bank to First Southern Bank Account #3058127506, in the name of Berman Kean & Riguera, Escrow for AMODEO ("Berman's First Southern Bank Account 2").

- On November 28, 2005; November 28, 2005; November 29, 2005; and December 1, 2005, $300,000.00, $1,500,000.00, $700,000.00 and $250,000.00, respectively, was transferred from the Ultimate Master Account to the Reserve Account. On December 1, 2005, $1,000,000.00 was transferred from the Reserve Account to Wellington's Mercantile Bank Account. On December 8, 2005, $1,050,00.00 was withdrawn from Wellington's Mercantile Bank Account via check 10034 and the funds were deposited in AMODEO'S Janney Montgomery Scott Account

23.      AMODEO and co-conspirators intended to transfer Presidion Solutions' book of business to AEM because: i) AEM had a better State Unemployment Tax (SUTA) rate than Paradyme and PBS, and ii) the Presidion Solutions name was tainted in the PEO industry due to previous tax and insurance problems. AEM was purchased by AMODEO in 2005 and was therefore a subsidiary of Mirabilis. At the beginning of 2006, Bank of America account 556191732 in the name of AEM, titled as the Depository Account ("Depository Account"), was opened to collect funds from Presidion Solutions' clients. The funds from the Depository Account were automatically transferred to Bank of America Account #5561911523 in the name of AEM, titled as the Master Account ("Master Account"). During this year, the funds from the clients payroll taxes for PBS were deposited into the Master Account, but were not used for that purpose. Instead, AMODEO directed funds transferred from the Master Account to SunTrust Bank Account #100041146787 in the name of Presidion Solutions, titled as the Capital Account ("Capital Account"). AMODEO diverted approximately $23,750,000.00 from the Master Account to the Capital Account. AMODEO controlled and directed all the banking activity of the Capital Account. After the funds were transferred to the Capital

13

Account, the funds were used by AMODEO to purchase, fund, and grow additional businesses, such as AQMI, Mirabilis, and Quantum.

24.    By late 2006, AMODEO had diverted over $180,000,000.00 in payroll tax funds, which were funds received from clients and diverted without the clients' knowledge, and used these funds to purchase approximately seventy (70) corporations. AMODEO had disguised the nature and source of the funds that had been used to purchase the corporations, property, and assets he controlled.

25.    In May 2007, AMODEO sold the Presidion Solutions/AEM book of business to another company for an $11,000,000.00 promissory note. After the sale was completed, AMODEO became aware that he had prepaid to Sunz Insurance ("Sunz") the workman's compensation insurance for his companies for the entire year of 2007 (eight months of insurance premiums had not been used). AMODEO collected from Sunz the refunds for workman's compensation insurance premiums that had been advanced to Sunz for AEM. AMODEO was fully aware the funds that were paid to Sunz had been paid for by the clients of AEM. AMODEO and co-conspirators set up accounts for AEM at Fifth Third Bank to handle any funds that could be collected on behalf of AEM. Any monies collected by AMODEO belong to former clients or the IRS, not AMODEO. Beginning in November 2007, AMODEO collected over $5,000,000.00 in workman's compensation insurance refunds from Sunz. AMODEO deposited the checks and wire transfers into Fifth Third Bank account #7440599210 in the name of AEM ("AEM Fifth Third Account") and further laundered these funds by transferring some of these funds to Fifth Third Bank Account #7440634728 in the name of AQMI ("AQMI Fifth Third Account"). AMODEO neither paid back his clients nor paid over any

14

of the funds to pay back the approximately $180,000,000.00 in back payroll taxes owed to the IRS; instead, AMODEO used the funds to retain attorneys to assist with various lawsuits around the country, pay his living expenses, transfer funds to other corporations he controlled, and pay employees.

26.    After the receipt of the refund for the workman's compensation insurance, three (3) current employees working for AMODEO set up a new corporation, Soone Business Development. Since August 2007, AMODEO has diverted over $300,000.00 to these employees as monthly fees from the AEM and AQMI accounts that were detailed above. AMODEO is continuing to use this corporation to conceal funds from the clients and the IRS.

### MONEY LAUNDERING

27.    Below are the financial transactions conducted by AMODEO, in violation of Title 18, United States Code, Sections 1343, 1956 and 1957, that were used to purchase assets that are subject to forfeiture. AMODEO used the various corporations and the various accounts detailed above to transfer the proceeds of the wire fraud and purchase the assets detailed below. After a thorough analysis of the accounts and corporations controlled by AMODEO, the only source of funds available to AMODEO for the purchase of the assets detailed below is from the proceeds of the wire fraud. Research conducted by your affiant reveals that after AMODEO was released from prison in 2001, he had various jobs, but did not earn a substantial income until the scheme subject to this affidavit began in 2004. Also, AMODEO owed previous trust fund taxes (over $400,000.00) from a previous business and did not have the ability to pay these taxes until 2004, when the scheme described in this affidavit began. A review

15

of AMODEO's tax returns reveals that in 2004, the year this scheme began, AMODEO reported income of over $700,000.00. In 2003 and 2002, AMODEO reported an income of $240,000.00 and $43,000.00, respectively.

a. **709 Euclid Drive, Orlando, Florida**

The purchase of AMODEO's personal residence at **709 Euclid Drive** was made through a series of transactions where payroll tax funds were moved through various corporations and eventually ended up in one of two of AMODEO's personal accounts: Janney Montgomery Scott Account #4493091 ("Janney Montgomery Scott Account") or Morgan Stanley Account #660022989157 ("Morgan Stanley Account"). A portion of the funds from the transactions relating to the purchase of the **709 Euclid Drive property** were then transferred through the trust account of AMODEO's attorney, Richard E. Berman (herein referred to as the "Berman Trust Account"). Documents received during the investigation reveal that when AMODEO purchased the residence, he titled the residence in the name of "Condor and Eagle," a Florida general partnership. The investigation has revealed that AMODEO has set up numerous corporations and partnerships in order to hide his assets. A detailed description of the scheme is as follows:

i.    Janney Montgomery Scott Account Transactions:

On December 29, 2004, AMODEO withdrew funds from the AQMI AmSouth Bank Account and purchased a cashier's check in the amount of $500,000.00. On February 16, 2005, AMODEO deposited the cashier's check into the Janney Montgomery Scott Account, his own personal account. AMODEO maintained the funds in the Janney Montgomery Scott Account until March 22, 2005, at which time, AMODEO wrote a check in the amount of $500,000.00, which was deposited into the Berman Trust Account. From the records obtained during the investigation, on April 14,

16

2005, AMODEO caused to be transferred $1,309,891.76 via wire transfer to the closing agent for the property to complete the purchase of the **709 Euclid Drive property**.

ii.    <u>Morgan Stanley Account Transactions:</u>

1.    On December 23, 2004, AMODEO caused to be transferred $150,000.00 and $750,000.00 from the AQMI AmSouth Bank Account into the Berman Trust Account. Thereafter, on December 27, 2004, AMODEO caused to be transferred $600,000.00 from the AQMI AmSouth Bank Account to the Berman Trust Account. On January 26, 2005, $500,000.00 of the total amount of the funds transferred to the Berman Trust Account were transferred to the Morgan Stanley Account, AMODEO's brokerage account.

2.    Additionally, in December 2004 and January 2005, AMODEO transferred funds totaling over approximately $1,000,000.00 from the AQMI AmSouth Bank Account to the Morgan Stanley Account.

3.    Subsequently, on February 10, 2005, AMODEO wrote check 1003 in the amount of $100,000.00 from the Morgan Stanley Account payable to the Berman Trust Account with a notation of "$25,000.00 and $75,000.00 earnest money Condor and Eagle." Then, on March 13, 2005, AMODEO wrote check 113 in the amount of $900,000.00 from the Morgan Stanley Account to the Berman Trust Account with a notation of "EC709."

AMODEO deposited the Morgan Stanley Account check and wire transferred Janney Montgomery Scott Account funds into the Berman Trust Account. Those funds were then wired to Independent Banker's Bank of Florida to complete the purchase of his residence at **709 Euclid Avenue**. This information was verified by the closing agent for the property.

Therefore, the above-referenced property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The property was bought with proceeds from AMODEO'S scheme to defraud his clients; thus, it is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the property was involved in the money laundering

17

scheme, in violation of 18 U.S.C. § 1956, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds from his scheme to defraud clients to purchase the property in the name of a shell corporation and moved these proceeds through various corporations' bank accounts to conceal the source of the funds used to purchase the property, in violation of 18 U.S.C. § 1956. Finally, the transaction detailed above was made in violation of 18 U.S.C. § 1957(a) because the funds used to purchase the property were derived from wire fraud violations and were in excess of $10,000.00 and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

b.    **1159 Delaney Drive, Orlando, Florida (Condominium)**

During an analysis of the funds used to purchase the **Delaney condominium**, it was revealed that funds originated from the Ultimate Master Account, which is the account that maintained the funds that should have been used to pay the payroll taxes. Funds from the Ultimate Master Account were then wired/transferred to the Reserve Account.

On November 7, 2005, AMODEO caused to be transferred $2,000,000.00 from the Reserve Account into the Berman Trust Account. As previously discussed in this affidavit, AMODEO controlled the Reserve Account and had sole signature authority on this account.

Thereafter, on or about December 15, 2005, AMODEO caused to be transferred $462,428.29 from the Berman Trust Account to The Closing Agent, the title company for the **Delaney condominium**, to complete the purchase of this property. This amount was used to partially satisfy the $510,000.00 purchase price for the **Delaney**

18

**condominium**, in addition to funds already deposited into the Berman Trust Account. AMODEO had the **Delaney condominium** titled in the name of "Condor and Eagle," the same name that AMODEO used to title his personal residence located at 709 Euclid Ave, Orlando, Florida.

Therefore, the above-referenced property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The property was bought with proceeds from AMODEO'S scheme to defraud his clients; thus, it is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the property was involved in the money laundering scheme in violation of 18 U.S.C. § 1956, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds from his scheme to defraud clients to purchase the property in the name of a shell corporation and moved these proceeds through various corporations' bank accounts to conceal the source of the funds used to purchase the property, in violation of 18 U.S.C. § 1956. Finally, the transaction detailed above was made in violation of 18 U.S.C. § 1957(a) because the funds used to purchase the property were derived from wire fraud violations and were in excess of $10,000.00 and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

c.    **4905 Research Drive, Huntsville, Alabama**

An investigation into the original source of the funds used to make the purchase of the **4905 Research Drive property** reveals that the funds originated from the Ultimate Master Account, which was the account that held the payroll tax funds. On November 2, 2005 and November 4, 2005, AMODEO directed employees to transfer $1,500,000.00 and $1,000,000.00, from the Ultimate Master Account into the Reserve

19

Account, the account over which he had sole signature authority. Then, on November 7, 2005, AMODEO had transferred $2,000,000.00 from the Reserve Account into the Berman Trust Account.

On January 18, 2006, AMODEO transferred $1,754,685.57 from the Berman Trust Account to Balch and Bingham, LLC, the closing agent for the property, for the purchase of the **4905 Research Drive property**. From the records obtained during the investigation and from witness statements, it has been determined that AMODEO titled the **4905 Research Drive property** in the name of "Degaboh, LLC", an Alabama corporation. A business associate close to AMODEO indicated that AMODEO controlled Degaboh, LLC, even though he is not listed as a director or officer of the corporation.

Therefore, the above-referenced property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The property was bought with proceeds from AMODEO'S scheme to defraud his clients; thus, it is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the property was involved in the money laundering scheme in violation of 18 U.S.C. § 1956, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds from his scheme to defraud clients to purchase the property in the name of a shell corporation and moved these proceeds through various corporations' bank accounts to conceal the source of the funds used to purchase the property, in violation of 18 U.S.C. § 1956. Finally, the transaction detailed above was made in violation of 18 U.S.C. § 1957(a) because the funds used to purchase the property were derived from wire fraud violations and were in excess of $10,000.00 and, as such, are subject to forfeiture pursuant to 18 U.S.C. §

20

981(a)(1)(A).

d.    **Proceeds from the Sale of 509 Riverfront Parkway, Chattanooga, Tennessee**

An investigation to determine the source of the funds used to purchase the **509 Riverfront Parkway property** reveals that on March 17, 2006, AMODEO directed the transfer of $1,300,000.00, from the Master Account to the Capital Account.  Then, on March 21, 2006, AMODEO directed the transfer of an additional $600,000.00 from the Master Account to the Capital Account.  On March 31, 2006, AMODEO again directed the transfer of $1,300,000.00 from the Master Account to the Capital Account.

Further investigation revealed that the source of the funds in the Master Account originated from the Depository Account, which was opened to collect funds from clients.  In March 2006, AMODEO caused to be transferred over approximately $8,000,000.00 in clients' funds from Depository Account to the Master Account.

After depositing $3,200,000.00 from the Master Account into the Capital Account, AMODEO signed a wire authorization on March 31, 2006, to wire $3,031,287.06 from the Capital Account to Pioneer Title Company to purchase the corporation WinPar Hospitality Management and the real property located at **509 Riverfront Parkway property**.

On May 18, 2007, WinPar Hospitality Management filed Chapter 7 bankruptcy in the Eastern District of Tennessee.  The only asset of the corporation was the above property and the trustee sought to liquidate the property to pay the creditors.  On April 2, 2008, the attorney for the trustee sold the property for $7,200,000 to Cameron Harbor, LLC.  The proceeds of the sale are currently held in a trust account of the trustee and

21

will be disbursed at a hearing on May 1, 2008. The United States only seeks to forfeit the net proceeds from the sale of the property, less the costs paid by the trustee from the sale of the property.

The above-referenced proceeds are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The property was originally bought with proceeds from AMODEO'S scheme to defraud his clients; thus, it is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the property was involved in the money laundering scheme in violation of 18 U.S.C. § 1956, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds from his scheme to defraud clients to conceal the source of the funds used to purchase the property by titling the property in the name of a shell corporation and moving these proceeds through various corporations' bank accounts, in violation of 18 U.S.C. § 1956. Finally, the transaction detailed above was made in violation of 18 U.S.C. § 1957(a) because the funds used to purchase the property were derived from wire fraud violations and were in excess of $10,000.00 and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

e.    **614 Lake Avenue, Orlando, Florida**

The purchase by AMODEO of the **614 Lake Avenue property** was made through a series of transactions where the clients' funds were moved through various corporations and eventually ended up in one of two of AMODEO's personal accounts: Morgan Stanley or Janney Montgomery Scott.

An investigation into the source of the funds used to purchase AMODEO's **614 Lake Avenue property** reveals that on December 1, 2005, AMODEO caused to be transferred $1,000,000.00 from the Reserve Account to the Wellington Mercantile Bank

22

Account. As discussed previously in this affidavit, all funds that were transferred into

the Reserve Account were traced back to the funds paid by Presidion Solutions clients

and deposited into the Ultimate Master Account. Then, on December 8, 2005,

AMODEO wrote check 10034 in the amount of $1,050,000.00 from the Wellington

Mercantile Bank Account and deposited check 10034 into the Janney Montgomery

Scott Account.

AMODEO purchased the **614 Lake Avenue property** for $979,000.00 on

November 6, 2006. On November 6, 2006, AMODEO wrote check 1043 in the amount

of $200,000.00 from the Morgan Stanley Account payable to Investment Title Services.

On the same date, AMODEO wrote another check from the Janney Montgomery Scott

Account, this time in the amount of $300,000.00, to Investment Title Services. Then, on

November 10, 2006, AMODEO wrote check 1065 from the Janney Montgomery Scott

Account in the amount of $408,062.26.00 to Jean Stiles (the seller of the **614 Lake**

**Avenue property**) to complete the purchase of the **614 Lake Avenue property**. The

record owner for the above property is "614 Lake Avenue Irrevocable Trust," a trust

controlled by AMODEO.

Therefore, the above-referenced property is subject to forfeiture pursuant to 18

U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The property was bought with proceeds from

AMODEO'S scheme to defraud his clients; thus, it is subject to forfeiture under 18

U.S.C. § 981(a)(1)(C). Additionally, the property was involved in the money laundering

scheme in violation of 18 U.S.C. § 1956, and it is subject to forfeiture under 18 U.S.C. §

981(a)(1)(A), because AMODEO knowingly used proceeds from his scheme to defraud

clients by moving tainted funds through various corporations' bank accounts to conceal

23

the original source of the funds and then purchasing the property with those funds, all in violation of 18 U.S.C. § 1956. Finally, the transaction detailed above was made in violation of 18 U.S.C. § 1957(a) because the funds used to purchase the property were derived from wire fraud violations and were in excess of $10,000.00 and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

f.    **3801 Carolina Avenue, Richmond, Virginia**

AMODEO purchased the **3801 Carolina Avenue property** under the name of "Hoth Holding." One of AMODEO'S close business associates has indicated that this corporation was set up specifically by AMODEO to hold the **3801 Carolina Avenue** property. Public records reveal that on May 17, 2006, AMODEO paid $1,400,000.00 for the property. A witness stated that AMODEO purchased this property because he intended to move some of the administrative operations of Mirabilis, a private equity fund controlled by AMODEO and other co-conspirators, to Virginia. Although the actual proceeds of the transactions used to purchase this property cannot be located at this point in the investigation, analysis of accounts and of corporations and witness statements by former employees of AMODEO reveal that the only source of funds available to AMODEO for the purchase of the **3801 Carolina Avenue property** was from the proceeds of wire fraud, i.e., the funds paid by clients that should have been used to pay the payroll taxes.

Therefore, the above-referenced property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A). The property was bought with proceeds from AMODEO'S scheme to defraud his clients; thus, it is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the property was involved in the money laundering

24

scheme in violation of 18 U.S.C. § 1956, and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because AMODEO knowingly used proceeds from his scheme to defraud clients to promote violations of 18 U.S.C. § 1343 and to conceal the source of the funds used to purchase the property, in violation of 18 U.S.C. § 1956. Finally, the transaction detailed above was made in violation of 18 U.S.C. § 1957(a) because the funds used to purchase the property were derived from wire fraud violations and were in excess of $10,000 and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

28.     Based on my training and experience, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income and try to conceal and disguise the source of the funds and conduct financial transactions with the intent to promote the carrying on of specified unlawful activity. AMODEO and co-conspirators conducted numerous financial transactions, described more fully above, to move the funds between various corporations and bank accounts to conceal and disguise the source of such funds. AMODEO and co-conspirators also conducted numerous financial transactions by setting up the corporations and paying the employees, rent, and other expenses through the various corporations to promote the carrying on the specified unlawful activity.

## CONCLUSION

29.     AMODEO and co-conspirators conducted numerous financial transactions by setting up corporations and attempting to move proceeds from their scheme to defraud clients between the various corporations' banks accounts to conceal and disguise the

25

source of such funds. Additionally, the **3801 Carolina Avenue, Richmond, Virginia** property was also used to promote the carrying on of AMODEO's scheme to defraud clients. Because these assets were involved in transactions in violation of 18 U.S.C. § 1956 (money laundering), or is property that is traceable to such an offense, these assets are subject to forfeiture pursuant to 18 U.S.C § 981(a)(1)(C).

30.    Moreover, because these transactions also involved tainted money in excess of $10,000.00, these transactions are in violation of 18 U.S.C. § 1957, and are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

_____
Steven McCabe, Special Agent


Sworn and subscribed to before me
this 24 day of April 2008.


Tyline R. Medina
Commission # DD590194
Expires December 29, 2010
Bonded Troy Fain - Insurance, Inc 800-385-7019

26